**James P. MITCHELL, Secretary of Labor, United States Department of Labor, Plaintiff,**

v.

**MOLTON, ALLEN & WILLIAMS, INC., a Corporation, Building Management Corporation, a Corporation, and Industrial Management Corporation, a Corporation; the Public Building Authority of the City of Birmingham and Calder Realty Company, Inc., Defendants.**

**Civ. A. No. 9417.**

United States District Court
N. D. Alabama, S. D.
Jan. 4, 1961.

**4**

Harold C. Nystrom, Acting Solicitor, Washington, D. C., Beverley R. Worrell, Regional Attorney, Birmingham, Ala., and Reuben S. Haslam, Attorney, of U. S. Department of Labor, Washington, D. C., for plaintiff.

White E. Gibson, Jr., of Lange, Simpson, Robinson & Somerville, Birmingham, Ala., for Molton, Allen & Williams, Inc., Building Management Corporation and Industrial Management Corporation.

William S. Pritchard, of Pritchard, McCall & Jones, Birmingham, Ala., for Calder Realty Co.

J. M. Breckenridge, City Atty., Birmingham, Ala., Public Building Authority of City of Birmingham.

GROOMS, District Judge.

### Findings of Facts

Following argument of counsel and a review of the briefs, and based upon the entire record in this case, including the pleadings, depositions and exhibits, and the oral testimony and exhibits, the Court finds:

1. That this action is properly brought by the Secretary of Labor, United States Department of Labor, under Section 17 of the Fair Labor Standards Act, as amended, 29 U.S.C.A. § 201 et seq., for injunctive relief against the defendants, Molton, Allen & Williams, Inc., Building Management Corporation, and the Industrial Management Corporation, from violating the minimum wage, maximum hour, and record keeping provisions of said Act. The Court has jurisdiction of this action and of the parties hereto.

That since October 22, 1956:

2. All office space in the Social Security Building located at 2225 Third Avenue, North, Birmingham, Alabama, and owned by the intervenor, the Public Building Authority of the City of Birmingham, is leased to the United States of America and these offices are occupied by (a) the Birmingham Payment Center, Bureau of Old Age and Survivors Insurance, Social Security Administration, Department of Health, Education, and Welfare, (b) the Birmingham Regional Office, Bureau of Accounts, Division of Disbursements, United States Treasury Department, and (c) the Communications Center, General Services Administration, United States Government.

3. The 712 employees of the Birmingham Payment Center, Social Security Administration, in the Social Security Building, have been and are regularly engaged in handling, working upon, otherwise processing, and approving benefit claim applications for Social Security benefit claimants residing in the States of Alabama, Georgia, Florida, Tennessee, Mississippi, Kentucky, North Carolina, South Carolina, Virginia, and West Virginia, in authorizing the United States Treasury Department to issue benefit checks by approving eligible benefit claims and by certifying benefit rolls each month; in handling voluminous correspondence with claimants and beneficiaries scattered throughout the ten Southeastern States identified above; in otherwise communicating with persons outside the State of Alabama; and in preparing and transmitting to the Headquarters Office of the Social Security Administration periodic and special reports; and that the work of employees of this Agency is principally concerned with and directed toward the timely issuance of Social Security benefit checks to eligible persons participating in this phase of the Federal Social Security Program.

4. The 112 employees of the Birmingham Regional Office, Bureau of Accounts, Division of Disbursements, U. S. Treasury Department, in the Social Security Building, have been and are producing large numbers of U. S. Treasury Department checks which are and have

been sent via United States mail to payees, including the Social Security beneficiaries under the jurisdiction of the Birmingham Payment Center located outside the State of Alabama.

5. The eight employees of the Communications Center, General Services Administration, in the Social Security Building, have been and are engaged regularly in handling out-of-state telephone calls and in transmitting to and receiving from persons located outside the State of Alabama teletype messages which are produced and transmitted in substantially the same manner as are commercial telegraph communications.

6. Employees of the Birmingham District Office of Internal Revenue Service, U. S. Treasury Department, 295 in number, occupy all of the office space in the Post Building located at 1531 Third Avenue, North, Birmingham, Alabama, and property of defendant, Molton, Allen & Williams, Inc., and within that building such employees of the United States of America have been and are regularly engaged in collecting Federal income taxes from residents of the State of Alabama; in handling, checking and otherwise working on income and Federal employer tax returns, and in forwarding substantial numbers of such returns to the Service Center of the Internal Revenue Service for additional handling, checking and processing; in originating and preparing numerous special and periodic reports which are transmitted outside the State of Alabama; in communicating with persons outside the State of Alabama by correspondence, telephone, teletype and otherwise.

7. All office space in the Calder Building, located at 18th Street and Third Avenue, North, Birmingham, Alabama, and owned by intervenor, Calder Realty Company, Inc., has been leased to the United States of America and has been occupied by agencies and employees of the United States.

8. The Headquarters Offices of the IV United States Army Corps (Reserve) are located in said Calder Building; these Headquarters Offices have occupied and do occupy all of two of four office space floors leased to the United States, and substantial portions of the two remaining floors; that the 200 employees of the IV United States Army Corps (Reserve) in the Calder Building and throughout the period charged by the complaint have been and are regularly engaged in the work of training, equipping, supervising and paying the active reserve forces of the United States Army in Florida, Alabama, and Mississippi; in originating, preparing in substantial quantities training manuals, directives, and instructions, and orders which are distributed from these headquarters to participants of the Army Reserve program in the States of Florida, Alabama, and Mississippi; in approving requisitions for procurement; in preparing regular and special reports which are required to be sent to higher commands outside the State of Alabama; in inspecting participating units to determine their compliance with manuals, instructions and directives and their progress and accomplishments under the program; and in communicating with persons outside Alabama by correspondence, telephone, teletype and otherwise.

9. The 16 employees of District D, United States Bureau of Mines, U. S. Department of Interior, in and from the Calder Building, have been and are regularly engaged in providing accident prevention and related instruction classes respecting mine and mill operations in the States of Tennessee, North Carolina, South Carolina, Georgia, Florida, Alabama, and Mississippi; in making safety inspections of coal mines in the states mentioned; in originating and preparing coal mine inspection reports for distribution outside the State of Alabama; in preparing regular and special reports for this Agency's headquarters offices in Washington, D. C.; and in communicating with persons outside the State of Alabama by telephone, teletype, correspondence, and otherwise.

10. The approximately 20 employees of defendant, Building Management Corporation, wholly owned by defendant,

6

Molton, Allen & Williams, Inc., have been and are engaged in operating the Social Security Building, in removing trash therefrom, and in sweeping, cleaning, servicing, and otherwise maintaining that building; that the 12 employees of defendant, Industrial Management Corporation, also wholly owned by Molton, Allen & Williams, Inc., have been and are engaged in operating the Post Building, in removing trash therefrom, and in sweeping, cleaning, servicing and otherwise maintaining that building; and that the 12 employees of defendant, Molton, Allen & Williams, Inc., have been and are engaged in operating the Calder Building, in operating certain freight and passenger elevators therein, in removing trash therefrom, in sweeping, cleaning, servicing and otherwise maintaining said building, and include maids, janitors, nightwatchmen, elevator operators, engineers and painters.

11. The three management companies, in conformity with building management contracts, undertake and agree to employ, supervise, and pay the necessary number and classes of maintenance employees to operate, clean and maintain the buildings in first-class order; to withhold income taxes from employees' wages, pay the employer's share of Social Security taxes and otherwise treat such employees as their own; to collect the rent from the tenants, deduct therefrom all cost of servicing and maintaining the buildings and management fees for doing so, and to remit the balance to the owners.

12. Many employees of defendants, Building Management Corporation, Molton, Allen & Williams, Inc., and Industrial Management Corporation, employed by defendants respectively, in building service and building maintenance work at the Social Security, Calder, and Post Buildings in Birmingham, Ala-

bama, have been and are being paid at rates less than $1 an hour.

13. Many employees of defendants, Building Management Corporation, Molton, Allen & Williams, Inc., and Industrial Management Corporation, employed by defendants respectively, in building service and maintenance work at the Social Security, Calder, and Post Buildings in Birmingham, Alabama, have been and are being employed for workweeks longer than 40 hours without being compensated for their employment in excess of 40 hours at a rate not less than one and one-half times the regular rate at which they were and are employed.

14. The time records maintained by Building Management Corporation, Molton, Allen & Williams, Inc., and Industrial Management Corporation for many of the employees employed by them respectively, in the operation and maintenance of the Social Security, Calder and Post Buildings, fail to show the hours worked each day and each week by such employees.

Opinion and Conclusions of Law

Th Court recognizes, as was noted in its pre-trial order dated January 19, 1960, that the "main issue * * * is one of coverage; if the employees are covered the injunction should be issued; if not, it should be denied."

In determining whether or not the affected employees are covered by the Act, consideration must be given to several statutory definitions and the treatment accorded such definitions by the Supreme Court of the United States and other appellate courts.

The Act provides that " 'Goods' means goods (including ships and marine equipment), wares, products, commodities, merchandise, *or articles or subjects of commerce of any character * * *.*" (Emphasis added.) [1]

. Section 3(i) of the Act reads as follows: "(i) 'Goods' means goods (including ships and marine equipment), wares, products, commodities, merchandise, *or articles or subjects of commerce of any character*, or any part or ingredient thereof, but does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof." (Emphasis added.)

As early as 1944, the Supreme Court ruled that the term "subjects of commerce" as used in the definition included telegraphic messages.[2] In reaching this conclusion, the Court said:

"The Government says messages are 'goods' because the Act defines 'goods' as therein used to include among other things 'articles or subjects of commerce of any character.' § 3(i). Of course, statutory definitions of terms used therein prevail over colloquial meanings. * * * That 'ideas, wishes, orders, and intelligence' are 'subjects' of interstate commerce in which telegraph companies engage has * * * been held. Western Union Tel. Co. v. Pendleton, 122 U.S. 347, 356, 7 S. Ct. 1126, 1127, 30 L.Ed. 1187. * * * We think telegraphic messages are clearly 'subjects of commerce' and hence they are 'goods' under this Act, as alleged in the complaint."

The evidence in this case establishes that personnel of the Government agencies occupying the offices in the Post, Calder, and Social Security Buildings have been and are regularly and continuously engaged in working on or in connection with "subjects of commerce" which are "goods" under the Act.

The work performed regularly and continuously by employees of the United States Government in the Post, Calder, and Social Security Buildings constitutes the "production of goods" within the meaning of the Act because of the statutory definitions of "goods" and "produced" and the decisions of the Supreme Court of the United States and other appellate courts construing and applying these definitions.

The Statute defines the term "produced" to mean "*'produced'* * * *

handled, or *in any other manner worked on in any State;* and for the purpose of this Act an employee shall be deemed to have been engaged in the production of goods if such employee was employed in *producing,* * * * *handling* * * * or *in any manner working on such goods* * * * *.*"[3] (Emphasis added.)

Within the context of the statutory definition, it is the conclusion of this Court that the word "produced" embraces the words "created" or "originated." Certainly, a U. S. Treasury check, a status report, an army directive, a manual of instructions, a procedural guide, or any other such "subjects of commerce" may be properly characterized as "produced" when it is created or originated as here. Further, it is clear that the definition of "produced" also embraces the terms "handled" and "worked on" as in the treatment accorded tax returns, tax refund requests, requisitions for supplies and equipment. As has been said by the Supreme Court of the United States, in Western Union Telegraph Co. v. Lenroot, supra;

"These are terms of ordinary speech and mean what they mean in ordinary intercourse in this context. They serve a useful purpose when read to relate to all steps, whether manufacture or not, which lead to readiness for putting goods into the stream of commerce. * * * We are clear that 'handled' or 'worked on' includes every kind of incidental operation preparatory to putting goods into the stream of commerce."

The evidence in this case establishes that substantial quantities of various "goods" are "produced" by employees of the Government in the Post, Calder, and Social Security Buildings and that these "goods" are intended to be and are transported or transmitted from the

2. Western Union Telegraph Co. v. Lenroot, 323 U.S. 490, 65 S.Ct. 335, 341, 89 L.Ed. 414.

3. "(j) 'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purpose of this Act an employee shall

be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any closely related process or occupation directly essential to the production thereof, in any State."

State of Alabama to places outside this State or among the several states. Thus, it is the conclusion of this Court that such "goods" are produced for commerce within the meaning of the Act in view of the Act's definition of commerce.[4]

The Court has considered the contention of defendants that employees of the United States Government in the buildings here involved have not produced goods for commerce since they were not produced for sale or exchange. This argument is rejected in light of the decision of the Supreme Court of the United States in Powell et al. v. United States Cartridge Company,[5] decided May 8, 1950.

The Court has considered also the contention of defendant-intervenor, the Public Building Authority of the City of Birmingham, that the service and maintenance employees working at the Social Security Building are constructive employees of the City of Birmingham and not within the coverage of the Act since they are, in truth, employees of the city. This defendant-intervenor here relies upon that part of Section 3(d) of the Act which excludes from the definition of employer "the United States or any State or political subdivision of a State."[6]

The evidence does not support the contention referred to and is refuted by the agreement entered into by and between the Public Building Authority of the City of Birmingham and the Building Management Corporation. This agreement provides in Section 2 in part as follows:

"2. (c) * * * All such employees shall be employees of the contractor and shall be under the supervision of the Contractor and its staff of supervisors and directed by rules and regulations established for Office Building Management.

"(d) The Building Authority reserves and shall have the right to approve the number, but not the selection and employment or retention, of employees hired by the Contractor for work in said building and Contractor agrees not to add additional employees to operating staff without first obtaining the Building Authority's consent."

The functioning of defendant, Building Management Corporation, in carrying out its agreement with the Public Building Authority of the City of Birmingham is clearly that of the employer of the service and maintenance employees here involved. The Building Management Corporation hires and fires such employees without any consultation with officials of the intervenor, and without regard to any rules and regulations having application to city employees. The entire arrangement between this intervenor and the Building Management Corporation was designed and operated so that this intervenor would not be the employer. The Supreme Court has made clear the question raised here must be resolved under "the terms of the contract and the rights and obligations of the parties under it,"[7] and upon "the actual conduct of the parties" under the agreement.[8]

The Building Management Corporation, in its arrangement with this intervenor, functions under a cost plus fixed management fee arrangement. This is the kind of situation under which the contractor was operating in Powell v.

---

4. The Act defines "Commerce" in Section 3(b) (29 U.S.C.A. § 203(b)) as follows:
   "(b) 'Commerce' means trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof."

5. 339 U.S. 497, 70 S.Ct. 755, 94 L.Ed. 1017.

6. Section 3(d) (29 U.S.C.A. § 203(d)) of the Act reads as follows:
   "(d) 'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee but shall not include the United States or any State or political subdivision of a State, or any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization."

7. State of Alabama v. King & Boozer, 314 U.S. 1, 9, 62 S.Ct. 43, 45, 86 L.Ed. 3.

8. Cosmopolitan Shipping Co. v. McAllister, 337 U.S. 783, 795, 69 S.Ct. 1317, 1324, 93 L.Ed. 1692.

United States Cartridge Company, supra. In the Powell, case, however, the United States exercised considerable control over employment relations of the contractor. The contractor contended the United States was, therefore, the employer in fact, and that its employees were outside the Act's coverage. The contractor's argument in that case was rejected by the Court as being without merit, and it is my conclusion that the argument of the Public Building Authority here cannot be accepted as valid.[9]

That janitorial and custodial activities performed at buildings in which "goods" are being produced for commerce constitute production of goods for commerce within the meaning of the Act has been settled by decision of the Supreme Court of the United States since 1942 when that Court decided A. B. Kirschbaum Co. v. Walling.[10]

In Kirschbaum, the Court was concerned with the identical question now before this Court—whether the Act applies to employees performing "the customary duties of persons charged with the effective maintenance" of buildings, the tenants of which were principally engaged in the production of goods for interstate commerce.

After considering all facets of the problem, the Court held:

"In our judgment, the work of the employees in these cases had such a close and immediate tie with the process of production for commerce,

and was therefore so much an essential part of it, that the employees are to be regarded as engaged in an occupation 'necessary to the production of goods for commerce.'"

The Kirschbaum decision is the nucleus of a long line of pre-1949 decisions which had held consistently that employees engaged in maintaining or guarding premises used by the occupants of those premises in the production of goods for commerce, as in the instant case, were covered by the Act.[11]

Prior to the 1949 amendment, employees were declared by Section 3(j) to be engaged in the production of goods for commerce (and therefore covered by the Act) if they were "engaged * * * in any process or occupation necessary" to such production. By the 1949 amendment, these words were changed to read "engaged * * * in any closely related process or occupation directly essential to" such production.

The new wording appears to the Court to be an adaptation of the language used by the Supreme Court in characterizing the maintenance and custodial activities in Kirschbaum that these activities had "a close and immediate tie with the process of production for commerce" and were therefore "an essential part of it * * *." The legislative history of the amendatory language makes it clear beyond a doubt that Congress intended to retain intact the Act's coverage of such maintenance and custodial activities.

9. The only evidence in the legislative history bearing on the meaning of Section 3(d) which has been brought to this Court's attention supports the conclusion that the "State or political subdivision of a State" exemption was not intended to apply to contractors with the Government. See Joint Hearings before the Senate Committee on Education and Labor, and the House Committee on S. 2475 and H.R. 7200 (75th Cong. 1st Sess.), page 82.

10. 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638.

11. See Borden Co. v. Borella, 325 U.S. 679, 65 S.Ct. 1223, 89 L.Ed. 1865; Walton v. Southern Package Corp., 320 U.S. 540, 64 S.Ct. 320, 88 L.Ed. 298; Roland

Electrical Co. v. Walling, 326 U.S. 657, 66 S.Ct. 413, 90 L.Ed. 383; Gangi v. D. A. Schulte, Inc., 2 Cir., 150 F.2d 694, affirmed 328 U.S. 108, 66 S.Ct. 925, 90 L.Ed. 1114; Merryfield v. F. M. Hoyt Shoe Corp., 1 Cir., 1942, 128 F.2d 452; Grant v. Bergdorf & Goodman Co., 2 Cir., 1949, 172 F.2d 109; Bozant v. Bank of New York, 2 Cir., 1946, 156 F. 2d 787; Roberg v. Henry Phipps Estate, 2 Cir., 1946, 156 F.2d 958; Baldwin v. Emigrant Industrial Savings Bank, 2 Cir., 1945, 150 F.2d 524, 161 A.L.R. 1234, certiorari denied 326 U.S. 767, 66 S.Ct. 171, 90 L.Ed. 462; Fleming v. Post, 2 Cir., 1944, 146 F.2d 441, 158 A.L.R. 1384; Walling v. Sondock, 5 Cir., 1942, 132 F.2d 77, certiorari denied 318 U.S. 772, 63 S.Ct. 769, 87 L.Ed. 1142.

That the Kirschbaum rule would continue to be the rule in building maintenance cases under the amended definition of the 1949 amendment was made plain in both branches of Congress.[12]

Decisions subsequent to the amendments hold that maintenance and custodial employees serving premises occupied by producers for commerce continued to be covered by the Act.[13]

12. The Managers on the Part of the House, in their statement accompanying the Conference Report on the Bill as enacted, said:

"The bill as agreed to in conference also does not affect the coverage under the act of employees who repair or maintain buildings in which goods are produced for commerce ([A. B.] Kirschbaum [Co.] v. Walling, 316 U.S. 517 [62 S. Ct. 1116, 86 L.Ed. 1638]) or who make, repair, or maintain machinery or tools and dies used in the production of goods for commerce. * * * All the employees mentioned in this paragraph are doing work that is closely related and directly essential to the production of goods for commerce (N.R.Rep. No. 1453, 81st Cong. 1st Sess., p. 14; 95 Cong.Rec. 14929)."

This Report continued:

" * * * the proposed changes are not intended to remove from the act maintenance, custodial, and clerical employees of manufacturers, mining companies *and other producers of goods for commerce*. Employees engaged in such maintenance, custodial, and clerical work will remain subject to the act, notwithstanding they are employed by an independent employer performing such work on behalf of the manufacturer, mining company, *or other producer for commerce*. All such employees perform activities that are closely related and directly essential to the production of goods for commerce. (Id., pp. 14928–14929; emphasis added.)"

The report of the Majority of the Senate Conference, also citing Kirschbaum, is to the same effect:

"Typical of the classes of employees whose work is closely related and directly essential to production, within the meaning of Section 3(j) as amended by the conference agreement, are the following employees performing tasks necessary to effective productive operations of the producer;

* * * * * *

"2. Employees repairing, maintaining, improving, or enlarging the buildings, equipment or facilities of producers of goods. Roland Electrical Co. v. Walling (326 U.S. 657, [66 S.Ct. 413, 90 L.Ed. 383]); [A. B.] Kirschbaum [Co.] v. Walling (316 U.S. 517 [62 S.Ct. 1116, 86 L.Ed.. 1638]); Borden Co. v. Borella

(323 [325] U.S. 679 [65 S.Ct. 1223, 89 L.Ed. 1865]); Walling v. McCrady Construction Co. (156 F.2d 932 (C.A.3)); Walling v. Mid-Continent Pipe Line Co. (143 F.2d 308 (C.A.10)); Bozant v. Bank of New York (156 F.2d 757 [787] (C.A.2)).

"3. Plant guards, watchmen, and other employees performing protective or custodial services for producers of goods. Walton v. Southern Package Corp., (320 U.S. 540 [64 S.Ct. 320, 88 L.Ed. 298]); Wantock v. Armour & Co. (323 U.S. 126 [65 S.Ct. 165, 89 L.Ed. 118]); Walling v. Sondock (132 F.2d 77, C.A.5); Engebretson [Engebretsen] v. [E. J.] Albrecht [Co.] (150 F.2d 602, C.A.7); Slover v. Wathen (140 F.2d 258, C.A.4); Shepler v. Crucible Steel [Fuel] Co. (140 F.2d 371, C.A.3); Walling v. Thompson (65 F.Supp. 686, D.C.Calif.).

"The work of such employees is, as a rule, closely related and directly essential to production whether they are employed by the producer of goods or by someone else who has undertaken the performance of particular tasks for the producer." (95 Cong.Rec. 14875; emphasis added.)

13. See Mitchell v. Joyce Agency, Inc., 348 U.S. 945, 75 S.Ct. 436, 99 L.Ed. 740; affirming Durkin v. Joyce Agency, Inc., D.C.N.D.Ill., 110 F.Supp. 918; Mitchell v. Famous Realty, 2 Cir., 1954, 211 F.2d 198, certiorari denied 348 U.S. 823, 75 S.Ct. 38, 99 L.Ed. 649; General Elec. Co. v. Porter, 9 Cir., 1953, 208 F. 2d 805, 911, 44 A.L.R.2d 854, certiorari denied 347 U.S. 951, 74 S.Ct. 676, 98 L.Ed. 1097; Russell Co. v. McComb, 5 Cir., 1954, 187 F.2d 524; Union Nat. Bank of Little Rock v. Durkin, 8 Cir., 1953, 207 F.2d 848; Thomas v. Associated Cleaning Contractors, Inc., 13 WH Cases 777; 35 Lab.Cas. § 71, 724 (N.D. Ga.1958, not officially reported); Messenger v. Traders Compress Co., D.C. E.D.Okl., 107 F.Supp. 354, reversed on other grounds sub nom. Tobin v. Traders Compress Co., 10 Cir., 1952, 199 F. 2d 8, certiorari denied 344 U.S. 909, 73 S.Ct. 329, 97 L.Ed. 701; Tobin v. Promersberger, D.C.D.Minn.1952, 104 F.Supp. 314; Broach v. McPherson, 220 Ark. 457, 248 S.W.2d 355, reaffirmed 1953, 222 Ark. 62, 257 S.W.2d 565; Tobin v. Hayes, 11 WH Cases 140, 22 Labor Cases 167, 208 (S.D.Fla.1952).

In Joyce Agency, Inc., [14] the Supreme Court, citing Kirschbaum, affirmed the decision of the District Court which had held that Congress had "no intention to overturn the existing law and exclude this class of employees from coverage by the Act." [110 F.Supp. 923] The Court for the Fifth Circuit held maintenance employees to be covered by the Act in Russell Co. case,[14] where a comparatively small proportion of the premises being guarded was devoted to production for commerce. The Court for the Eighth Circuit, in Union National Bank,[14] in upholding coverage of maintenance employees who "sweep, clean and mop the floors, dust the furniture and fixtures, and generally maintain the Bank's quarters in a proper condition of cleanliness and order so as to permit the carrying on of the Bank's business," [207 F.2d at page 850] said:

> "The legislative history of the amendment made in 1949 to the definition of the term 'produced' in Section 3(j) of the Act, shows that the change in that definition was not intended to affect the coverage of the Act in so far as maintenance employees such as those involved in the present case were concerned." Id., 207 F.2d at page 852.

Having concluded that the building service and maintenance employees who are employed in operating, cleaning, sweeping and otherwise maintaining the Social Security, Post and Calder Buildings are engaged in the production of goods for commerce within the meaning of the Act, it may be unnecessary for this Court to consider the question of whether such employees are also engaged in commerce. However, in view of all facets of this case, including its apparent importance in the administration and enforcement of the Act, I have felt constrained to consider the question of whether these employees are also engaged in commerce within the meaning of the Act, and to reach conclusions with respect to it in light of the facts before the Court in this litigation.

It seems clear to the Court that the employees of the various agencies of the Government having offices in the Social Security, Post and Calder Buildings are constantly and continuously engaged in commerce within the meaning of this term as defined by the Act. They are regularly engaged in communicating with persons outside the State of Alabama by mail, telephone, teletype and personal travel on official business. Further, each agency is an integral part of a nationwide organization that is comparable in many respects to traditionally recognized instrumentalities of commerce.

It is my conclusion that the building service and maintenance employees, under the facts of this case, contribute so materially and directly to these "in commerce" activities of the various governmental agencies occupying space in these buildings as to be in practice and in legal contemplation a part of those "in commerce" activities. I find adequate support for this conclusion in the decision of the United States Court of Appeals for the Fifth Circuit, in Russell Company, Inc. v. McComb, 1951, 187 F.2d 524, 526, wherein that Court held:

> "We are of opinion the trial court correctly held that appellant's night watchman is engaged in commerce and in the production of goods for commerce in such degree as to come within the scope of the Fair Labor Standards Act. The holding that the watchman's activities 'contribute so materially and directly to the flow of goods in commerce "as to be in practice and in legal contemplation a part of it" ' is in accord with the prevailing authorities. Overstreet v. North Shore Corp., 318 U.S. 125, 63 S.Ct. 494, 87 L.Ed. 656; Cf. McLeod v. Threlkeld, 319 U.S. 491, 63 S.Ct. 1248, 87 L.Ed. 1538; See also Fitzgerald Const. Co. v.

14. See next preceding footnote.

**12**

Pedersen, 324 U.S. 720, 65 S.Ct. 892, 89 L.Ed. 1316; Boutell v. Walling, 327 U.S. 463, 66 S.Ct. 631, 90 L.Ed. 786; Walling v. Sondock, 5 Cir., 132 F.2d 77, Cf. Spaeth v. Washington University, [240] Mo.App. [79], 213 S.W.2d 276."

I also find support for this conclusion in the many decisions holding that building maintenance and service employees, cleaning and otherwise maintaining facilities of traditionally recognized instrumentalities of commerce, are themselves engaged in commerce and covered by the Act.[15]

From the foregoing, the Court concludes that at all times since October 22, 1956, the defendants, and each of them, have failed to meet the requirements of Sections 6, 7 and 15(a) (2), and 11(c) and 15(a) (5), and consequently are in violation thereof, by paying some of their employees engaged in commerce and in the production of goods for commerce and referred to herein, wages at rates less than $1 per hour, by employing some of said employees for workweeks longer than 40 hours without compensating them at a rate not less than one and one-half times the regular rate, and by failing to make, keep, and preserve records for some of said employees showing the hours worked each day and each week by them. The Court finds no intentional or willful noncompliance or violation of the provisions of the Act in the particulars indicated. The defenses interposed have been asserted in good faith. These considerations, however, do not justify continued noncompliance with and violation of the Act. They will be weighed in molding the injunctive relief which the Court concludes the plaintiff is warranted. A judgment will be entered accordingly, but only after the Court has had an opportunity to consider with counsel for the parties the form of decree.

15. See Engebretsen v. E. J. Albrecht Co., 7 Cir., 150 F.2d 602; Mid-Continent Petroleum Corp. v. Keen, 8 Cir., 157 F. 2d 310; Walling v. Mutual Wholesale

Food & Supply Co., 8 Cir., 141 F.2d 331; Walling v. Sondock, 5 Cir., 132 F. 2d 77, certiorari denied 318 U.S. 772, 63 S.Ct. 769, 87 L.Ed. 1142.